Filed 9/2/21  In re Nancy F. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Nancy F., a Person Coming Under the Juvenile Court Law. | B309537 |
| | (Los Angeles County Super. Ct. Nos. 20CCJP02406, 20CCJP02406A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MARIA F.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Annabelle G. Cortez, Judge.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Jane Kwon, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Sixteen-year-old N. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) after she reported that she and her mother, Maria F. (mother), got into repeated arguments in which mother hit N., scratched her, pinched her, and pulled her hair. Mother admitted to one altercation with N., and DCFS's investigation revealed that family members and N.'s therapist were aware of additional altercations. The juvenile court exercised jurisdiction over N. under Welfare and Institutions Code section 300, subdivisions (a) and (b)(1).[1]

On appeal, mother asserts that substantial evidence did not support the juvenile court's finding that N. was at risk of suffering serious physical harm. In the alternative, mother contends the juvenile court failed to consider whether mother's actions constituted reasonable parental discipline, and she asks that we remand the case to allow the juvenile court to make that finding. We find that substantial evidence supports the court's findings and that remand is not warranted. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Non-detention

On April 15, 2020, DCFS received a referral regarding physical abuse by mother against N. The report stated that on April 3 and 12, mother pinched and slapped N., and pulled N.'s

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

hair.  N. stated that she was afraid of mother's retaliation if N. reported her to DCFS.  N. lived with mother and her two half-siblings, 13-year-old R. and 12-year-old A.; R. and A. were reported to be at risk as well.

The family had nine prior referrals from 2007 to 2019.  In 2007 and 2008 reports that mother left then-toddlers N., R, and A. home alone were deemed unfounded.  In 2015, there were two reports of sexual abuse of N. and general neglect by father, stating that a man named Cesar, who had been living in father's home, twice had touched N. on her breasts and buttocks over her clothing.  DCFS deemed the sexual abuse allegation inconclusive and the general neglect allegation unfounded.  In November 2016, there was a report that mother physically abused N.; all three children stated that mother hit or "tapped" N. on the face or mouth.  N. gave varying accounts and DCFS deemed the allegations inconclusive.  In January 2017, there was a report that mother physically abused N. The basis for the report is not entirely clear, but the report states, "Child [N.] indicated that she did not tell anyone that her mother shoved her head against the wall."  The allegation was deemed inconclusive.

In March 2017, there was a report of physical abuse of N. by N.'s stepfather, S.F. (stepfather); N. alleged that stepfather hit her in the face and stomach, and wrestled with her.  N. later retracted her allegations, and the allegation was deemed unfounded.  In May 2019, there was a report of physical abuse of N. by mother in which N. was seen with a bleeding lip, and she reported that mother had punched her in the face with a fist.  Mother denied the allegations and stated that N. was seeking attention.  N.  told medical staff that she actually bit herself, and a forensic exam found the mark to be consistent with a self-

induced bite mark. N. later explained to a social worker that she had slipped in the bathtub while having a "tantrum," causing her to fall and bite her lip. The allegation was deemed inconclusive.

On April 16, 2020, a children's social worker (CSW) met with N. at a Los Angeles Police Department (LAPD) station. N. stated that she did not feel safe with mother. N. reported that on April 3, 2020, N. went to her boyfriend's court date without mother's permission, and when N. got home mother wanted her to take a shower. When N. delayed, mother "became upset and started hustling her to go into the shower," and scratched N.'s arm or shoulder. N. no longer had a mark from the scratch. N. said another incident occurred on Easter (April 12), when N. said she was not ready to leave but "the mother did not care and when they got in her car, she was tying her shoes and the mother yelled at her for not having a mask on." N. said the fights with mother "are always over similar things." N. also said that mother records her when she is "having a mental breakdown," and refuses to stop when N. asks her to. N. said she used to use marijuana but no longer does. She also said she had a therapist named Henry, but "mother randomly stopped taking her."

N. also said that stepfather raised her since she was two years old and treats her as his own child, but mother "always reminds her" that he is her stepfather and limits her contact with him, while her half-sisters' contact with stepfather is not similarly limited. N. said she had reconnected with her biological father (father) about three years earlier, and mother was upset about it. N. stated that she and mother "do not know how to communicate." The CSW asked if N. would be willing to return home if mother began counseling, and N. said "she was willing to

give it a chance because [N.] wants her mother to better understand her."  N. went to stay at stepfather's home.

The CSW spoke with mother at the family home, and a second CSW spoke with mother in a follow-up phone call.  At the initial visit, the CSW noted that mother "appeared very agitated" when she was told the reason for the visit.  "[M]other stated that she was sick of social workers showing up to the home and telling [N.] that mother could go to jail if she was hitting her. Mother stated she is sick of the child's threats against her."  Mother said that N. is "very rebellious" and "always looking for attention." When mother did not allow N. to do things, N. threatened to call police and told mother she hoped mother would get deported. Mother said N.'s latest allegations arose after a fight about pictures N. posted on Instagram of herself in a bra and underwear; "[s]ome pictures were zoomed into the pelvic area and one was of her buttocks in underwear."  Mother said that as they were "fighting over [N.'s] phone," mother "might have scratched her but it was not intentional."

Mother "then began a rant about how [N.] wants to live with" father, which mother was angry about because father abandoned her while she was pregnant, "he never provided and now appeared out of nowhere" to spend time with N.  Mother said that "all of this was happening because the system has let [N.] down"; for example, the man that sexually abused N. when she was 11 was never arrested.  Mother said N.'s behavior changed after the sexual abuse; N. became withdrawn and then started getting upset more often.  Mother said she tried to get N. counseling through Kaiser, but there was a long wait list, so mother found counseling at a clinic through "victims of crime." Mother said that "after Kaiser called her and . . . denied services,

5

Kaiser also called DCFS on her. Mother appeared very frustrated." "Mother stated that [N.] has had a lot of unnecessary attention by DCFS which was why she thought she could run her own show. Mother stated that she is not going to allow the system to continue to ruin her daughter and she wanted her home that night."

Mother showed the CSW videos of N. "having mental breakdowns." In the videos, N. "comes out banging her fist on the table, her head on the table, yelling at her mother to leave her alone. In another video, [N.] threatens [mother] telling her 'you'll see' if she did not stop recording her." Mother said she began video recording N. because "she thinks [N.] needs more psychological help." Mother said N. had seen a therapist, Elizabeth, who was "not helpful." Mother also said N. had been kicked out of several schools "for fighting and smoking marijuana." Mother further said that three weeks earlier N. had been diagnosed with a sexually transmitted infection. Mother also said another parent told her that N. sneaked her son into mother's home, after which N. and the boy left at about 3 a.m. to smoke marijuana. "Mother stated she is extremely embarrassed because she does not leave the children alone and [N.] did this while mother was sleeping."

Mother said that N. had an 18-year-old boyfriend who was incarcerated for drug possession. N. recently went to his court hearing, and when she came home mother "yelled at her and told her to change out of her clothes due to COVID-19 and [N.] was on her phone ignoring her." Mother was angry about N.'s "careless tendencies." Mother said N. hangs out with the "wrong crowd" and is using marijuana. Mother said N. acts depressed, but she is not suicidal. Mother said she was afraid to discipline N.

6

because of her threats to call law enforcement.  Mother said she attempted to get support for N., but N. refuses to participate.  Mother said she was open to support from DCFS, but "stated the minor [N.] is the problem."

The CSWs also interviewed stepfather at the family home.  Stepfather stated that he did not live there, but he helps mother coparent the children.  Stepfather said he and mother got together when N. was about two years old.  Stepfather denied seeing mother hit N., but said that N. and mother do not get along.  Stepfather said N. is rebellious, disregards mother's rules, and "does as she pleases."  He also said that he is "not at the home a lot" so he knew only what other family members told him.  Stepfather said N. was not doing well in school and she "became more aggressive 2-3 years ago."

The CSWs interviewed 13-year-old R., who said that the previous weekend mother and N. got into a fight about N. posting pictures on social media, and N. had a "mental breakdown" in the car.  R. described a mental breakdown as "crying and yelling at the same time."  R. said N. would call mother names, and identified several swear words N. would use.  R. also said she had seen mother pull N.'s hair after N. got home when she was not supposed to be out; N. slapped mother's arm and mother pulled N.'s hair.  R. believed N. used marijuana because N. vaped and R. had seen N. eat an edible that smelled like marijuana.  R. denied any physical abuse toward her and said she felt safe in the home.

The CSWs also interviewed 12-year-old A., who said N. and mother argue a lot.  She said that N. "is always getting in trouble."  N. plays loud music, slams doors, and yells at mother; mother also yells at N.  A. said N. does whatever she wants even when mother tells her to stop.  A. also said that N. sometimes

7

comes home smelling of beer or marijuana. A. denied any physical abuse or drug use in the home.

A CSW met with N. again on April 21, 2020. N. was staying at stepfather's home, stepfather was staying in mother's home, and stepfather's mother who lived nearby was checking in on N. periodically. N. again said that on April 3, N. went to her boyfriend's court date without mother's permission, and when N. got home mother wanted her to take a shower. When N. did not do it right away, mother pushed N. and scratched her arm. N. no longer had the scratch mark. N. also said that on April 12 mother "became frustrated with [N.] about her not putting on a mask." N. and mother got into an argument in which mother pinched N., slapped her, and pulled her hair. N. said she and mother fight about "the littlest things." N. said she reported that mother had hit her in the past, but she later recanted her allegations because she was afraid of DCFS involvement and "she would prefer for her and mother to work things out."

N. said she would be willing to return home if mother participated in therapy with her and stepfather continued to live in the home. N. said mother is nicer to her when stepfather is there, "maybe because he is a witness to what takes place" in the home. N. also said she would like to live with father. N. said she was willing to cooperate with DCFS and participate in services.

The CSW spoke with father by phone. Father said he was unable to care for N. The CSW therefore had mother and stepfather come to pick up N., and everyone agreed to the safety plan of working with DCFS, participating in services, and having stepfather remain in mother's home.

The CSW spoke with N.'s counselor, Henry. Henry said N. was referred through school, and he had been working with N. for

about a year "to help and support her with family challenges." N. had revealed "physical discipline" by mother. Once mother "punched" N. on the mouth, but N. later recanted her story due to fear of DCFS involvement; mother told N. not to say she was punched, because her half-siblings would be taken away. N. had also disclosed "other physical altercations" with mother. Henry said N. also told him about the incidents on April 3 and 12 in which mother slapped N., pinched her, and pulled her hair. Henry said he had not observed marks or bruises on N.

In a conversation with the CSW on April 24, father said N. had disclosed that mother hit her on "multiple occasions." Father said he and mother do not communicate much; he had not addressed the hitting with mother because mother has custody and father was unable to care for N. Father was not interested in participating further in the DCFS investigation.

The CSW concluded that the safety assessment "clearly indicated that physical abuse exists in the home and poses an imminent danger of serious and/or emotional harm" to N. DCFS also noted that mother "antagonized" N. by recording her when she is emotional, even after N. asked her to stop. DCFS noted that there was a "pattern of [N.] misbehaving, but also mother disciplining [N.] inappropriately." DCFS stated that it intended to open a court case because mother "has not been able to control the minor and has continued to . . . inappropriately discipline the minor by hitting her."

On April 29, 2020, DCFS filed a juvenile dependency petition under section 300, subdivisions (a) and (b)(1). Counts a-1 and b-1 alleged that on April 3 and 12 mother physically abused N. by pinching her, slapping her, and pulling her hair. Counts a-1 and b-1 further alleged that mother scratched N. on April 3,

9

and that on other occasions mother had struck N. on the mouth and pulled N.'s hair. Counts a-1 and b-1 also alleged that father knew of mother's abuse and failed to protect N., and that the abuse placed N. at risk of serious physical harm. Count b-2 alleged that mother and father "have a limited ability to provide appropriate parental care and supervision of the child due to the child's behavioral problems. Such limited ability on the part of the mother and the father endangers the child's physical health and safety and places the child[ ] at risk of serious physical harm, damage and danger." The petition noted that N. was not detained.

At the non-detention hearing on May 4, 2020, mother and father each entered a general denial. DCFS, mother, father, and N. requested that the court order an assessment and referral for services. The court found a prima facie case that N. was a person described by section 300, released her to parents, and ordered DCFS to assess which services would best fit the family's needs. The court also ordered an assessment of N. for any individual needs.

## B.    Jurisdiction and disposition

An interim review report dated October 28, 2020 stated that N. remained released to parents and had been enrolled in a residential military-style academy in July. The CSW had visited N. several times, and aside from some "minor issues" shortly after N. began attending the academy, N. was doing well. The report stated that N. was not participating in therapy or conjoint counseling because mental health services were not available at the academy. N.'s previous counseling had been terminated when she entered the academy. The CSW noted that

10

communication with the academy "has been difficult," and the academy did not respond to requests for information about N.

When the CSW spoke with father in October 2020, father said he did not have an open DCFS case, he had not seen N. in months, and mother had custody of N. Father said N. was in "boot camp" and he was not even sure she was his daughter. Father said he did not want to have anything to do with the case.

The CSW had spoken to mother on the phone twice. Mother continued to deny the allegations, and stated that in April 2020 N. "had banged her head on a wall during a fit" of anger. The CSW noted that N. disputed mother's claims, and had "reported on multiple occasions" that mother physically disciplined N. The interim review report stated that because mother continued to deny abusing N. and mother had not submitted to any services, continuing services on a solely voluntary basis may not be appropriate.[2]

N. had little contact with the family "due to the program restrictions" at the academy, and initially communicated with them only through letters. N. had entered a stage of the program that allowed communication through phone calls; she and mother had talked on the phone three times. N. reported that the phone communication with family members had been positive. The family had not been assigned to any services.

The jurisdiction/disposition report filed November 3, 2020 stated that N. was still at the academy and was expected to be

---

[2] In September 2020, N. suggested that mother might have a "drinking problem," citing an incident in which mother became "aggressive after drinking a few beers." DCFS investigated the allegation, but did not seek to amend the petition on this basis, and the court did not make any jurisdictional findings relating to alcohol abuse.

discharged on November 25. The CSW had not been able to contact N. at the academy. The CSW met with mother on October 30 at mother's home. Mother was cooperative but "guarded when questioned about the allegations." Mother "adamantly denied" she ever hit, pinched, or pushed N., or pulled her hair. Mother spoke instead about N.'s behavioral and emotional problems, saying that after N. was sexually abused at age 11, she "has not been okay." Mother said N. is easily triggered into "crises" in which she gets "hysterical" and verbally abusive. Mother said N. starts crying, gets destructive, slams doors, and throws things. Mother said N. had a boyfriend who was a gang member. She also said she had found N. "passed out" with some boys, and she called police on N. numerous times. A summary of calls to LAPD showed that mother called police twice when N. had left the home without permission; there was also one call involving N.'s bloody lip, and two calls relating to the incidents that led to the juvenile court case.

Mother said that prior to enrolling N. in the academy, she had "lost control" of N. Mother said, "I have done everything for [N.]," including taking her to counseling and getting her into the academy, and "that is why me being investigated is unfair." Mother wanted N. to come home after she was discharged from the academy, and mother did not want any services from DCFS. Mother planned to have N. enroll in school in Pasadena and begin seeing therapist Elizabeth again. Mother said DCFS had "not helped me with anything. I have been investigated many times unfairly and no one from [DCFS] has ever helped me so I can take care of [N.] on my own."

DCFS again concluded that mother would not be amenable to voluntary services since she denied the allegations of abuse.

DCFS stated that based on "a review of the child's statements[,] the Child Welfare history, LAPD call logs, interviews with the mother and collaterals, it is evident the mother has a clear pattern of exercising excessive and inappropriate physical discipline toward" N. DCFS stated that mother's continued denials were "concerning." DCFS noted that N. admitted that she had recanted earlier allegations of abuse for fear that her siblings would be removed. DCFS also stated that father knew of the abuse and failed to protect N. N. had behavioral and emotional problems, and she engaged in high-risk activities such as leaving home without permission, using drugs, and engaging sexual activity. DCFS observed that Mother and father "are clearly limited in their ability to provide appropriate parental care and supervision" of N. Although mother made efforts to seek services for N., mother remained in denial about how her actions contributed to N.'s behavior and "continues to blame the child for the current problems."

A last-minute information filed November 18, 2020 stated that N. had been in therapy through an online platform since August 2020, and the CSW had spoken to the therapist. N. had "improved a lot," and was feeling "more confident and happy about her accomplishments." N. was "very motivated and wants to return to her old school and graduate." The therapist said N. was getting along well with mother, but she also expressed concern that when N. returned to the home environment, "Is mom going to be able to provide support and be more understanding of [N.]?" Mother had completed two one-hour parenting workshops.

A police report from April 15, 2020 was included with the last-minute information. The report stated that N. told police

about the incidents with mother on April 3 and 12, and said she was "tired of her mother abusing her." N. said that on April 3 when she did not get in the shower as mother requested, "her mother 'came at her' and started to attack her." Mother grabbed N.'s wrists then grabbed N.'s hair to pull her toward the bathroom. N. also said that mother was "always 'coming at her' for no reason." Police observed minor scratches on N.'s wrists that "appeared old and fully healed." A. said she did not witness the incident, and R. said she witnessed the argument but did not see a physical altercation. The officer stated that the investigation "revealed no evidence of abuse," but N. was transported to the police station and DCFS was contacted.

The CSW spoke with N. at the academy on November 12, 2020. N. again confirmed the incident on April 3 when mother told her to take a shower. N. said that in that incident, mother grabbed N.'s hair but did not pull it. N. could not recall whether the April 12 incident was the one in which mother pushed her, pinched her, and pulled her hair because N. did not put on a face mask. N. also recalled the incident in which she got a split lip. She did not remember what the argument was about, but mother had grabbed her arm and was pulling her, and mother "accidentally hit me in my mouth with her elbow or something." N. said she did not think mother punched her. N. confirmed that father was aware that mother would hit her.

N. admitted that she had not been well-behaved in the past, and said, "I see now that my mom was trying to look out for me. She has sacrificed and done a lot for me and I was ungrateful." N. said she had limited contact with mother while she was at the academy, and she was willing to live with mother and participate in services once she graduated from the program.

14

A case manager from the academy would continue to follow up with the family for 12 months after graduation.

At the jurisdiction hearing on November 19, 2020, N.'s counsel requested that the petition be sustained with amendments to conform to proof. N.'s counsel noted that mother admitted engaging in at least one physical altercation with N. regarding her phone in which she scratched N.'s arm; R. confirmed the altercation. N.'s counsel also noted that father confirmed he knew mother hit N. N.'s counsel stated that mother clearly cares about N., "but while mother acknowledges that [N.] went through a traumatic experience, she really continues to treat her more like she is an out-of-control teenager as to [*sic*] someone who needs support in services." N.'s counsel argued that mother's consistent refusal of any services "indicates there is a current risk and mother does lack insight into how to best address [N.'s] issues."

Mother's counsel asked that mother be stricken from the allegations in counts a-1 and b-1 regarding physical abuse, and said mother "adamantly denies" that she ever hit N. or pulled her hair. Mother's counsel said that the "scuffles" in the family home were "just due to the unique family dynamic" and mother never intended harm. Mother said she wanted N. to continue services after she returned home. Mother also asked to be stricken from count b-2, stating that she had enrolled N. in various services and the academy, showing that mother was "trying to do the best she can to provide for N. and address the ongoing needs she has."

Father's counsel asked that count a-1 be stricken from the petition for lack of evidence of an intentional act. Regarding count b-1, father's counsel argued that it was not clear that father could have protected N. because mother had custody

15

pursuant to a court order, and there was no evidence that father had the ability to change it. Father's counsel asked that father be stricken from count b-2 because there was no nexus between father and any alleged risk of harm.

DCFS's counsel asked that the petition be sustained in full, and did not object to the amendments proposed by N.'s counsel. DCFS's counsel noted that although N.'s behavior had been frustrating, the evidence showed that mother would attack N. when she got upset with her. DCFS noted that the relationship had improved while N. was living at the academy, but there was a continued risk of harm once N. returned to her home environment, as expressed by N.'s therapist in the last-minute report. DCFS's counsel also noted that father knew what was happening, did nothing to stop it, and refused to participate in the case.

The court sustained counts a-1 and b-1 as amended, removing specific allegations of mother's hitting, pinching, and hair-pulling, and stating instead that mother physically abused N. "on multiple occasions by engaging in physical altercations with" N. The court also sustained count b-2 as amended, removing "due to the child's behavioral problems" and replacing it with "due to behavioral issues." The court found a future risk of harm to N. based on the concerns of the therapist. The court also noted that although N. had been engaging in services, mother's rejection of all services "and the lack of insight" presented a continuing risk to N. The court observed that N. made "a lot of the efforts," but mother and father had not.

Turning to disposition, all parties agreed that a home-of-parents order would be appropriate, with various services provided for the family. The court therefore issued a home-of-

parents order, and ordered various services tailored to the family's needs, including age-appropriate parenting classes and individual counseling.

Mother timely appealed.  Father did not appeal.

## DISCUSSION

Mother contends there was insufficient evidence to support the juvenile court's jurisdiction finding based on serious physical harm or a risk of serious physical harm to N.  In the alternative, mother asserts the court failed to evaluate whether mother's conduct constituted "reasonable discipline," and asks that the case be remanded for a determination on that basis.  DCFS asserts that mother's appeal is not justiciable, sufficient evidence supports the court's findings, and mother waived any reasonable discipline contention.  We find that mother's contentions are justiciable, substantial evidence supports the court's jurisdiction finding, and remand is not warranted.

## A.    Mother's appeal is justiciable

DCFS contends that mother's appeal is not justiciable because the juvenile court exercised jurisdiction over N. based on allegations against father as well as mother, and father has not appealed.  Mother responds that she "challenges *all* jurisdictional findings, not just the findings pertaining to mother."  She also argues that because the findings against father involved failure to protect N. from mother's abuse, it would be illogical to reverse the findings relating to mother and not reverse the findings relating to father.

In general, when only one parent appeals a finding of jurisdiction, the parent's appeal may be non-justiciable. "Because the juvenile court assumes jurisdiction of the child, not the parents, jurisdiction may exist based on the conduct of one parent

17

only. In those situations an appellate court need not consider jurisdictional findings based on the other parent's conduct." (*In re J.C.* (2014) 233 Cal.App.4th 1, 3.) Here, however, mother has challenged whether N. suffered, or was at risk of suffering, serious physical harm. This finding underlies all counts in the petition, including the allegations involving both mother and father. Thus, if mother's challenge to jurisdiction were successful, it would require reversal of the entire jurisdictional order, not just jurisdiction as to mother. We therefore find mother's appeal justiciable.

**B.    Substantial evidence supports the jurisdiction finding**

Mother asserts the court's findings under section 300 were not supported by substantial evidence because the evidence did not suggest that N. suffered, or was at substantial risk of suffering, serious physical harm or illness. Section 300, subdivision (a) requires a court to find that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm." Subdivision (b)(1) requires a court to find that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness."

"'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

18

Mother asserts that "no reasonable factfinder could have found that mother 'physically abused'" N. Citing only evidence in her favor, mother argues that N.'s story about the physical altercations with mother was "not corroborated," and mother points out that N. retracted her allegation that mother hit her in the mouth. Mother asserts that N.'s "wildly varying accounts" cannot support a jurisdiction finding.

We are not persuaded. In essence, mother argues that N. was not credible; however, issues of fact and credibility are the province of the juvenile court. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Drawing all reasonable inferences in favor of the juvenile court's order, there was sufficient evidence that mother and N. engaged in "physical altercations," as alleged in the petition. Mother admitted trying to wrest N.'s phone from her and scratching N.'s arm in the process. N. reported that mother had punched her in the mouth and injured her lip; N.'s therapist explained that N. later changed her story in an effort to protect her siblings. N. also reported that on other occasions mother hit her, pinched her, grabbed her wrists, pushed her, and pulled her hair. R. witnessed mother pull N.'s hair after N. went out without permission. Father and N.'s therapist were also aware of the ongoing abuse. The court's finding that mother engaged in physical altercations with N. was supported by sufficient evidence.

Mother contends that even if there was evidence of physical altercations, "there is no evidence in the record that [N.]'s injuries amounted to 'serious physical harm.'" Mother asserts that at most, N. suffered only a small scratch on her arm and a cut lip. Mother argues these minor injuries cannot "meet the statutory threshold" for serious physical harm.

19

However, section 300, subdivisions (a) and (b)(1) allow for a finding of jurisdiction if there is a *risk* the child will suffer serious physical harm. Section 300, subdivision (a) states that "a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child . . . , or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (§ 300, subd. (a).) Under subdivision (b)(1), a risk of harm exists when violence in the home is ongoing or likely to continue. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717.) Here, mother repeatedly expressed her displeasure with N. by pulling N.'s hair, grabbing her, pinching her, hitting her, and pushing her. These altercations left N. with a bloody lip and scratches on her arms. It is well established that "the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383.) A parent who repeatedly resorts to physical violence when angered by a defiant child presents a risk of serious harm to the child.

Mother compares this case to *In re Isabella F.* (2014) 226 Cal.App.4th 128 (*Isabella F.*), in which ten-year-old Isabella "reported that mother hit her in the face, grabbed her by the neck, and locked her in the bathroom. . . . A social worker reported that Isabella had scratches, consistent with fingernail scratches, on one side of her face and had a gouge mark on her left earlobe consistent with a fingernail injury." (*Id.* at pp. 131-132.) After the juvenile court case began, the mother began taking anger management classes, researched how to deal with defiant children, participated in weekly individual therapy, and

sought out additional resources. (*Id*. at p. 134.) The Court of Appeal held that Isabella's injures did not amount to "serious physical harm" under section 300, subdivision (a), noting that the altercation had been an isolated incident, mother was contrite and seeking services, and DCFS found little risk of future harm. (*Id*. at pp. 138-139.)

*Isabella F*. is inapposite. Here, there was a long history of physical altercations between mother and N. Father, R., and N.'s therapist were aware of the ongoing physical altercations. The family had a history of reports to DCFS and LAPD. Unlike the mother in *Isabella F*., mother blamed N. for the family's problems and refused to acknowledge her own role in causing or contributing to them. Mother refused all services and blamed "the system" for failing N. The relationship between N. and mother improved when N. moved out, but N.'s therapist was concerned about N.'s return to the family home. Mother's plan upon N.'s return home was to enroll her in a local school and have N. see her former therapist, Elizabeth, whom mother said was "not helpful" at the beginning of the case. The factual circumstances in *Isabella F*. are not comparable, and the court's reasoning is not persuasive here. Substantial evidence supports the juvenile court's finding that the physical altercations between mother and N. posed a substantial risk of serious physical harm.

Mother also argues there was insufficient evidence to support the court's finding on count b-2, which stated that mother and father had "a limited ability to provide appropriate parental care and supervision of the child due to behavioral issues." Mother argues that she "has always provided [N.] with every possible kind of service and support."

Because we find that there was sufficient evidence to support jurisdiction based on mother's physical abuse of N., we need not address this contention. "When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

Nevertheless, substantial evidence supported this basis for jurisdiction as well. First, we emphasize that the juvenile court's jurisdictional finding on this basis is not a condemnation of mother's efforts, as mother suggests. To the contrary, "the first clause of section 300(b)(1) does not require parental culpability." (*In re R.T., supra*, 3 Cal.5th at p. 629.) Instead, jurisdiction under section 300, subdivision (b)(1) may be appropriate when a child faces a risk of harm due to self-destructive behavior that a parent cannot control. (*Id.* at p. 634.)

Mother made clear to DCFS that she felt she could not control N. Mother told the CSW that before N. began going to the academy, mother had "lost control" and was unable to discipline N. N. had been expelled from schools for fighting and smoking marijuana. N. was having emotional breakdowns that included banging her fists and head on a table; mother said she recorded these breakdowns to prove that N. needed more psychological help. N. was leaving the house without permission and she had contracted a sexually transmitted infection. Mother said her

22

efforts at disciplining and finding therapy for N. had been ineffective, and father was not involved in addressing any family issues.  The evidence was sufficient to support the juvenile court's finding that mother and father had a limited ability to provide appropriate care and supervision to N. in light of the behavioral issues at play.

## C.      Remand is not warranted

Mother asserts, in the alternative, that the juvenile court "failed to apply the correct legal standard in evaluating whether mother's conduct was reasonable parental discipline."  Mother argues that N.'s "misbehavior and defiance of house rules were the impetus for the conduct in question."  Mother states that she reasonably disciplined N. by taking away her phone or restricting her from going out with friends, and "the physical scuffles that prompted this proceeding resulted because mother was unsuccessful in removing [N.'s] cell phone or enforcing limits."

DCFS asserts that mother forfeited this argument by failing to assert it below.  We agree.  If mother believed a specific legal standard was applicable, she was obligated to assert that position in the juvenile court.  Mother argues that her general arguments against jurisdiction were sufficient, because "this case clearly has always revolved around the question of whether mother's approach to [N.'s] 'behavior issues' was reasonable."  However, "[g]eneral objections are insufficient to preserve issues for review.  [Citation.]  The objection must state the ground or grounds upon which the objection is based."  (*In re E.A.* (2012) 209 Cal.App.4th 787, 790.)  Mother's general arguments against jurisdiction did not preserve for appeal her contention about "reasonable discipline."

23

Even if mother had not forfeited this argument, however, it is not persuasive.  A parent may reasonably discipline a child.  (See § 300, subd. (a) ["'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury"]; *Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 86 ["'a parent has a right to reasonably discipline his or her child'"].)  "Whether a parent's use of discipline on a particular occasion falls within (or instead exceeds) the scope of this parental right to discipline turns on three considerations:  (1) whether the parent's conduct is genuinely disciplinary; (2) whether the punishment is 'necess[ary]' (that is, whether the discipline was 'warranted by the circumstances'); and (3) 'whether the amount of punishment was reasonable or excessive.'" (*In re D.M.* (2015) 242 Cal.App.4th 634, 641.)

N.'s misbehavior here included not taking a shower as quickly as mother wanted, not wearing a face mask, refusing to hand her phone to mother, and leaving the house without permission.  Mother's reactions to these incidents included hitting N. on the mouth, scratching, pinching, pushing, and hair pulling.  Such reactions are not "genuinely disciplinary" actions warranted by the circumstances.  The physical altercations occurred as part of the "constant" fights between mother and N., and nothing in the record suggests any physical altercations were "disciplinary" as opposed to expressions of mother's frustration.  Remand is not warranted to allow the court to assess mother's actions as reasonable discipline.

# DISPOSITION

The juvenile court's jurisdiction order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

MANELLA, P. J.

CURREY, J.